UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEON HATHAWAY #432250,

        Petitioner,                  Hon. Jane M. Beckering

v.                                Case No. 1:20-cv-891

S. L. BURT,

        Respondent.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Hathaway's petition for writ of habeas corpus.   In accordance with 28 U.S.C. § 636(b), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner habeas petitions, the undersigned recommends that Hathaway's petition be denied.

## BACKGROUND

As a result of events which occurred between January 1, 2009, and March 4, 2013, Petitioner was charged with four counts of First Degree Criminal Sexual Conduct and three counts of Second Degree Criminal Sexual Conduct.   Several individuals testified at Petitioner's jury trial.   The relevant portions of their testimony are summarized below.

1

**Jasmine Kesemeyer**

For the first "ten plus" years of her life, Kesemeyer believed that Petitioner, who was the father of her two younger siblings, was likewise her biological father. (ECF No. 10-9, PageID.584, Trial Transcript, January 23, 2014, at 127-28). Kesemeyer eventually learned, however, that Petitioner was not her biological father after which her relationship with Petitioner changed. (*Id.*, PageID.584 at 128). Petitioner began to treat Kesemeyer like she was "his wife." (*Id.*). Specifically, Petitioner told Kesemeyer that "he wanted to be with [her] and more than a way as his daughter." (*Id.*). From there, the situation "just escalated." (*Id.*).

Kesemeyer's mother worked long hours whereas Petitioner rarely worked. (*Id.*, PageID.587 at 140-41). As a result, Petitioner was "always at home" with Kesemeyer and her siblings. (*Id.* at 141). Petitioner began groping Kesemeyer sexually and eventually began having intercourse with her. (*Id.* at 130-45). Petitioner assaulted Kesemeyer "hundreds" of times. (*Id.,* PageID.584-88 at 138, 143). Petitioner also supplied her with alcohol and marijuana. (ECF No. 10-11, PageID.710, Trial Transcript, January 28, 2014, at 144-45).

When Kesemeyer's younger sister reached the age Kesemeyer had been when Petitioner began sexually assaulting her, Kesemeyer told one of her friends what Petitioner had been doing. (ECF No. 10-9, PageID.588-89, Trial Transcript, January 23, 2014, at 146-47). Shortly thereafter, a Child Protective Services worker arrived at Kesemeyer's home to investigate. (*Id.* at 147). When Kesemeyer told Petitioner

that she had reported what he had done, Petitioner told Kesemeyer that he would "kill himself" and that she "better deny this or else." (*Id.* at 147-48). Scared what Petitioner might do, Kesemeyer recanted her allegations. (*Id.* at 147-49).

Following this incident, Petitioner stopped abusing Kesemeyer "for a while." One night, however, Kesemeyer's mother caught Petitioner attempting to sexually assault her daughter in the kitchen. (*Id.* at 149-50). Petitioner "left for a period of time," but eventually returned without protest from Kesemeyer's mother. (*Id.*, PageID.589-90 at 150-51). Kesemeyer eventually reported to a school counselor what Petitioner had been doing to her after which Petitioner was removed from the house. (*Id.* at 153-54). Kesemeyer later discovered letters that Petitioner wrote to her mother from jail. (*Id.* at 156-60). In one of these letters, Petitioner wrote the following:

> I've been thinking about our visit and what we talked about, and the more I think about it, the more it sounds like a plan. It could be – that could be the way out. Ask her how she would like her boyfriend sitting in jail away from her for something he actually did. Tell her to end this, and you won't press charges on Jared,[1] and he won't have to come to jail with me.
>
> I'm being serious as a heart attack right now. She doesn't testify, this ends, and Jared doesn't go to jail. Just don't write anything in a letter, because they read incoming mail. No one gets in trouble if she refuses to testify, and everyone goes on with their lives.

(*Id.* PageID.592-93 at 160-63).

In a second letter, Petitioner wrote the following:

---

1 Jared was Jasmine Kesemeyer's then boyfriend. (*Id.* at 153).

All we have to do is get me out of here and move on.  You are my everything, baby, and I can't do this without you.  I need you to be strong and a little more fearless.   This is our family, and as long as our children are taken care of, then there isn't anything they can do.   They can talk and use scare tactics against us – against you, but that only works if you let it.

I know you're just doing it so they – so they – they end everything, and that's fine, but as far as you putting your foot down with Jasmine and giving her an ultimatum, that needs to happen, because – I read that – the choice – she's going to choose Jared and shut her mouth.

(*Id.*, PageID.594 at 167-70).

Feeling "overwhelmed" by Petitioner's abuse and everything that she was experiencing, Kesemeyer later attempted suicide.   (ECF No. 10-10, PageID.642, Trial Transcript, January 24, 2014, at 61-62).

On cross-examination, Kesemeyer conceded that she did not report Petitioner's behavior when it was occurring.   (*Id.*, PageID.628-32, 637 at 4-19, 37-39). Kesemeyer further conceded that Petitioner was a "disciplinarian" who "dished out the punishment" at home.   (*Id.*, PageID.632 at 20).   For example, Petitioner "grounded" Kesemeyer for sneaking out of the house to meet a boy.   (*Id.*, 19-21). Petitioner prohibited Kesemeyer from spending time with certain people.   (*Id.*, 20-22).   Petitioner was jealous of Kesemeyer's relationship with her boyfriend Jared and prohibited the two from spending time together.   (*Id.*, PageID.632, 643-44 at 20-22, 66-67).   Petitioner also took Kesemeyer's phone from her.   (*Id.*, 22-23).

4

**Tammy Kesemeyer**

Tammy Kesemeyer is Jasmine Kesemeyer's mother.   (ECF  No.  10-10, PageID.646, Trial Transcript, January 24, 2014, at 77).   Petitioner is the father of Tammy  Kesemeyer's  two  younger  children,  Hunter  Hathaway  and  Morgan Hathaway.   (*Id.*, 78).   During the fifteen years Tammy Kesemeyer was in a relationship with Petitioner, Kesemeyer worked full-time whereas Petitioner only occasionally worked.   (*Id.*, PageID.646-47 at 78-80).   As a result, Petitioner was home with the children much of the time.   (*Id.* at 78).   Because Jasmine arrived home from school much earlier than the two younger children, Petitioner was often home alone with Jasmine.   (*Id.* at 80).

When Child Protective Services first investigated Jasmine's allegations that Petitioner was sexually assaulting her, Jasmine recanted her allegations.   (*Id.*, PageID.647-48 at 82-84).   After Jasmine recanted her allegations, Petitioner began disciplining Jasmine and limiting the people with whom she could associate.   (*Id.*, PageID.648-49 at 84-87).   One night in early 2013, Tammy walked into the kitchen and discovered Jasmine and Petitioner "standing" together.   (*Id.* at 88-89).   Because it "was late" and the lights were all off, Tammy began yelling, "what the hell are you doing up?   Why are the lights off?   Why are you not in bed?"   (*Id.* at 89).   Tammy "kicked [Petitioner] out" of the house and then went upstairs to talk with Jasmine. (*Id.* at 90).

Jasmine told her mother that her previous allegations against Petitioner were true and that she recanted her allegations "because she was scared." (*Id.*, PageID.650 at 91-94). In response, Tammy was "not supporting" of her daughter's allegations. (*Id.* at 94). Tammy responded this way because she "didn't want to accept" what her daughter was telling her. (*Id.*, PageID.650-51 at 94-95). Even after Petitioner's arrest, Tammy maintained contact with Petitioner, visiting him in jail and speaking with him on the phone. (*Id.* at 96).

Tammy also received letters from Petitioner which she kept. (*Id.* at 96-97). In one of these letters, Petitioner communicated that "maybe if we put Jared's, you know, head on the chopping block, that maybe Jasmine will stop talking about this or not testify." (*Id.* at 97). Tammy understood that Petitioner "wanted to make sure [Jasmine] didn't come to court. . .[because] if she doesn't testify, if there's nobody to testify, then they have no charges on him." (*Id.*, PageID.654 at 107-08). Petitioner wrote several other letters urging Tammy to dissuade Jasmine from testifying. (ECF No. 10-11, PageID.679-84, Trial Transcript, January 28, 2014, at 20-41).

Tammy eventually changed her opinion of Petitioner. (ECF No.10-10, PageID.652 at 101). After having "a lot of time to sit back and just think about things and see things," she realized that "some things. . .wasn't right." (*Id.* at 101). For example, with respect to the incident where she discovered Petitioner and her daughter in a dark kitchen late at night, Tammy realized there was "no reason [for

them] to be standing there in the middle of the night with no lights on."  (*Id.*).
Tammy also realized that Petitioner gave more attention to Jasmine than his own
two children.  (*Id.* at 102).

**Hunter Hathaway**

Hunter noticed that Petitioner would often "want to be alone with Jasmine."
(ECF No. 10-11, PageID.692, Trial Transcript, January 28, 2014, at 73-74).   Hunter
and his younger sister, Morgan, would often go outside to play, but Jasmine was not
allowed to join them and instead had to remain indoors with Petitioner.  (*Id.*,
PageID.693 at 75-76).   Petitioner would also "go into Jasmine's room" to "tell her
stuff."  (*Id.* at 76).   Hunter also noticed that Jasmine acted differently around
Petitioner depending on if their mother was also present.  (*Id.* at 77).   When their
mother was not at home, Jasmine acted "closed" around Petitioner.  (*Id.*).

**Morgan Hathaway**

When Morgan arrived home from school in the afternoon, Jasmine was already
at home with Petitioner.   (ECF No. 10-11, PageID.694, Trial Transcript, January 28,
2014, at 81-82).   Jasmine "would always sit on [Petitioner's] lap and go on car rides
with him," but Morgan was not allowed to do those things.   (*Id.*, PageID.695 at 83).
Petitioner often went into Jasmine's room and stayed for "like a half hour or
something like that."  (*Id.* at 83-84).   Petitioner often sent Morgan and her brother
outside to play, but Jasmine was not permitted to join them.  (*Id.* at 84).   Morgan
also observed Petitioner and Jasmine smoking together in the mornings.  (*Id.* at 85).

**Leon Hathaway**

Petitioner began his relationship with Tammy Kesemeyer when her daughter, Jasmine, was one year old.   (ECF No. 10-11, PageID.697, Trial Transcript, January 28, 2014, at 92-93).   Petitioner raised Jasmine "like a father," but Jasmine eventually learned that Petitioner was not her father which upset her.   (*Id.* at 93-94).   Petitioner was the disciplinarian of the household.   (*Id.*, PageID.698 at 98). When Jasmine did things such as sneak out of the house, lie about her whereabouts, drink, or smoke marijuana, Petitioner would ground her, take her phone away, assign her extra chores, or prohibit her from hanging out with certain people.   (*Id.*, PageID.699 at 99-100).   Petitioner denied sexually assaulting Jasmine.   (*Id.*, PageID.699-700, 702 at 94, 102, 106, 111).

Following the presentation of evidence, the jury found Petitioner guilty of four counts of First Degree Criminal Sexual Conduct and three counts of Second Degree Criminal Sexual Conduct.   (ECF No. 10-13, PageID.788-92, Trial Transcript, January 30, 2014, at 3-7).   Petitioner was sentenced to serve consecutive sentences of 25-50 years on two of the convictions and concurrent sentences of 18-30 and 10-15 years on the remaining convictions.   (ECF No. 10-13, PageID.800-06, Sentencing Transcript, March 5, 2014, at 6-12).   Petitioner appealed his convictions in the Michigan Court of Appeals asserting the following claims:

> I.    The trial judge's questioning of defendant – during which the judge took on the role of the prosecutor, clearly implied that he disbelieved defendant and believed the complainant, emphasized the prosecution's evidence, and required defendant to comment

on the complainant's credibility – demonstrated bias against the defense, denying defendant a fair trial.

II.     Defendant was denied his right to pre-trial discovery and the late disclosure of a stack of letters denied him a fair trial.

III.    Defendant was denied a fair trial and the motion for mistrial should have been granted when a prosecution witness was allowed to vouch for the credibility of the complainant.

IV.     The prosecutor denied defendant a fair trial by commenting on defendant's religious faith, implying that defendant wanted his daughter to commit suicide and that he would have molested the complainant's younger sister, appealed to the sympathy of the jury, and misstated the evidence; trial counsel was ineffective for failing to object.

V.      Defendant was denied his right to be sentenced on the basis of accurate information and he must be resentenced where the sentencing guidelines were mis-scored; trial counsel was ineffective for failing to object.

VI.     Because neither of the CSC I sentencing offenses arose from the same transaction, the sentences must be amended to run concurrently.

VII.    Defendant's sentencing violated the Sixth and Fourteenth Amendments to the United States Constitution because the court engaged in judicial fact-finding that increased the floor of the range of permissible sentence in violation of the rule of *Alleyne v. United States*, 133 S.Ct. 2151 (2013).

The Michigan Court of Appeals affirmed Petitioner's convictions. *People v. Hathaway*, 2015 WL 3917620 (Mich. Ct. App., June 25, 2015). Raising the same issues, Petitioner moved in the Michigan Supreme Court for leave to appeal. *People v. Hathaway*, 879 N.W.2d 265 (Mich. 2016). The court affirmed Petitioner's convictions but remanded the matter to the trial court "to determine whether the court would have imposed a materially different sentence under the sentence

9

procedure described in *People v. Lockridge*," decided after Petitioner's original sentencing. *Id.* On remand, the trial court affirmed Petitioner's sentence. (ECF No. 13-2 , PageID.1303-05). The trial court later denied Petitioner's motion for relief from judgment. (ECF No. 13-3, PageID.1306-15). Petitioner now moves for habeas relief in this Court asserting the claims identified above as well as two additional claims, identified below, which Petitioner raised for the first time in his post-conviction motion for relief from judgment asserted in the trial court.

## STANDARD OF REVIEW

Hathaway's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
> >
> > (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002). As the Supreme Court recently emphasized, this standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation omitted).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result."  *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).   A writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411.   Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable.  *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12.

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary."  *Ayers*, 623 F.3d at 308.  Accordingly, a decision "adjudicated on the merits in a state court and based

on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Ibid.*

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy either subsection therein.   This requirement, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"   *Harrington v. Richter*, 562 U.S. 86, 100 (2011). Instead, if a state court rejects a federal claim, a federal habeas court "*must presume* that the federal claim was adjudicated on the merits."   *Johnson v. Williams*, 568 U.S. 289, 301 (2013).   If this presumption is overcome, however, the Court reviews the matter de novo.   *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

## ANALYSIS

## I.    Judicial Bias

As noted above, Petitioner testified at his criminal trial.   At the conclusion of Petitioner's testimony, the trial judge questioned Petitioner.   Petitioner argues that he is entitled to relief because the trial judge's questioning violated his right to a fair trial.   The exchange in question is as follows:

> THE COURT: I have a few questions. And I want to preface some of these questions with a comment. I have no position in this case, ladies and gentlemen. I don't want you to think I'm going one way or

the another because I ask these questions. You'll recall, I think, I've asked other folks questions also.

Mr. Hathaway, as I understand your defense, it's that this – none of this ever happened?

THE WITNESS: No, sir.

THE COURT: So you saw this young lady that's sitting in the back of the courtroom testify, and you saw her demeanor in front of the jury, you saw the tears that she had, and you're saying that that's all lies, that's untrue.

THE WITNESS: It's all lies sir.

THE COURT: And you're saying it's untrue because you grounded her, you took her cell phone, and she was leaving the house when she wasn't supposed to, and because of these things, she's made these allegations and testified before this jury that – that you sexually assaulted her hundreds of times?

THE WITNESS: Yes, sir.

THE COURT: You admitted you wrote these letters, correct?

THE WITNESS: Yes, sir.

THE COURT: She didn't write any letters, correct, saying let's get our stories straight or let's get together on this?

THE WITNESS: Tammy? No.

THE COURT: No, no, I mean Jasmine.

THE WITNESS: No, sir.

THE COURT: And when I listened to the letters, and I don't know whether it's true, the jury can, as far as numbers, the jury can total up, but the prosecutor mentioned there were 16 times that statements were made – burn it was made at one point, what did you mean burn it?

13

THE WITNESS: That was – I was gonna write Jasmine a letter and try to talk to her, but I decided against it, and that never even happened.

THE COURT: All right. You also mentioned if she's out of court, I'm out, or words to that effect. Not want me in the house, I'll leave. I'll quit living in the home. Reassure her you'll not let me back in the home. Get her not to testify. Get our stories straight, convince her not to testify. Write down the notes so we get it right together. Get used to telling the story, convince her not to testify.

THE WITNESS: When I –

THE COURT: One second. Will lose the house if – use your imagination. You said all of those things?

THE WITNESS: Yes, I did.

THE COURT: Anywhere in those letters did you – you did profess in some of those letters that I heard, I didn't do this, right?

THE WITNESS: Yes, sir.

THE COURT: And that's – and that's what you've told us. Anywhere in those letters did you say tell her to tell the truth?

THE WITNESS: I don't recall. I'm sure I did in some of the letters.

THE COURT: You also lived with Jasmine's mom for 15 years, had two children, correct?

THE WITNESS: Yes, sir.

THE COURT: You signed it "your husband," but I want to make sure that I understand, you were never married, correct, to this lady?

THE WITNESS: Correct. No, sir. No, sir.

THE COURT: All right. And you told her about dreams you had about walking her down the aisle and her dad being there and the

14

birds singing or whatever it was and – very moving letters, but indicating that you were going to be able to get married finally?

THE WITNESS: Yes, sir.

THE COURT: And you've told us that you love Jasmine like you love your own daughter?

THE WITNESS: I did.

THE COURT: What – what does this mean? Read this sentence right here, starting right there to yourself, where the arrow is.

THE WITNESS: This right here?

THE COURT: You, yeah. Read that to yourself. You wrote that?

THE WITNESS: I did.

THE COURT: Why would you – why would you tell Tammy to charge her rent?

THE WITNESS: Because she moved out of the house and wanted to come back.

THE COURT: She – how old was she?

THE WITNESS: Fifteen, 16 at the time. This was after I was already gone and she was staying with whoever else and she wanted to come back home.

THE COURT: I guess, again, why would you charge a child rent?

THE WITNESS: I was – I was just angry and frustrated. I mean, half of the stuff I said I didn't really mean. It was just out of frustration and not knowing what to do.

THE COURT: You've told us you smoked cigarettes with her and rolled cigarettes, smoked them together?

THE WITNESS: Yes, sir.

15

THE COURT: And she was, what, 15 or 16?

THE WITNESS: Yes, sir.

THE COURT: Did you ever roll or smoke marijuana with her?

THE WITNESS: Never.

THE COURT: How tall are you?

THE WITNESS: About six, three.

THE COURT: What do you weigh?

THE WITNESS: 230.

THE COURT: Questions by the jury? There are no questions. Any questions, Ms. Barnes, as a result of anything the Court's asked?

MS. BARNES: No, Your Honor.

THE COURT: Mr. Piazza?

MR. PIAZZA: No, Your Honor.

THE COURT: All right. Thank you very kindly. You may step down. Thank you.

(ECF No. 10-11, PageID.707-09, Trial Transcript, January 28, 2014, at 134-39).

The Fourteenth Amendment to the United States Constitution guarantees to every criminal defendant the right to a "fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Coley v. Bagley*, 706 F.3d 741, 750 (6th Cir. 2013) (quoting *Bracy v. Gramley*, 520 U.S.

899, 904-05 (1997)).    To prevail on his claim of judicial bias, Petitioner must demonstrate that the trial judge exhibited conduct "so extreme as to display clear inability to render fair judgment."   *Liteky v. United States*, 510 U.S. 540, 551 (1994)).[2]

While the Court is troubled by the extent of the trial judge's questioning of Petitioner, it is not reasonable to interpret this exchange as reflecting an inability by the trial judge to act fairly or otherwise secure for Petitioner a fair trial.   The trial judge largely questioned Petitioner regarding matters about which he had already testified and, moreover, afforded Petitioner the opportunity to reiterate and elaborate on his theory that Jasmine Kesemeyer lied because she was being disciplined by Petitioner for various acts of misbehavior.   The Michigan Court of Appeals rejected this claim, finding:

> As a practical matter, the trial court's questions were little more than a blunt and succinct summary of defendant's theory of the case. Consequently, the trial court's questioning did not truly undermine defendant's defense, elicit any inconsistent testimony, inject any new theories, or demolish theories in operation.   A trial court must avoid assuming the prosecutor's role with advantages unavailable to the prosecution.   Here, the questioning was *technically* improper, but the trial court twice made clear to the jury prior to questioning that it did not have a position in the case and was asking questions to clarify and expand on the defense, including defendant's claim that he was innocent and that the victim manufactured the allegations due to his setting limits on her behavior as a step-parent.   The trial court's questions were permissible because they did not add to nor distort the evidence.

2 While *Liteky* addressed the statutory recusal standard for federal judges, the Sixth Circuit has long relied on this decision to govern claims of judicial bias such as advanced by Petitioner.   *See Lyell v. Renico*, 470 F.3d 1177, 1186 (6th Cir. 2006); *see also, United States v. Bankston*, 820 F.3d 215, 233 (6th Cir. 2016).

*Hathaway*, 2015 WL 3917620 at *2.

This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.    *See, e.g., Copeland v. Walker*, 258 F.Supp.2d 105, 137 (E.D.N.Y. 2003) (discussing multiple instances in which judicial questioning of a criminal defendant did not violate the defendant's right to a fair trial).    Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.    Accordingly, this claim raises no issue upon which habeas relief may be granted.

## II.    Pretrial Discovery

Tammy Kesemeyer began, but did not complete, her testimony on Friday, January 24, 2014.    Petitioner's trial resumed on Tuesday, January 28, 2014.    Before Kesemeyer resumed her testimony, the prosecutor, outside the presence of the jury, informed the court that, when Kesemeyer arrived to testify the previous Friday, she "brought with her a bag of letters that she had never given to us and had never discussed with us prior to the date."    (ECF No. 10-11, PageID.675, Trial Transcript, January 28, 2014, at 6).    As the prosecutor continued, "[w]e did not know that she had [these letters].    The only letters we were aware of were the letters that Jasmine had taken from her [mother's] purse, and from our discussions with Jasmine those are the only letters she saw."    (*Id.*).    Petitioner argues that his right to a fair trial was violated by the "late disclosure" of the letters in question.

Even if the Court assumes that the challenged conduct violated some state law or rule, such affords Petitioner no relief in this Court.   As is well recognized, "[t]here is no general constitutional right to discovery in a criminal case." *Crawford v. Mazza*, 2022 WL 18434419 at *2 (6th Cir., Dec. 6, 2022) (quoting *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977)).   Moreover, the Court discerns no unfairness to Petitioner.  As the Michigan Court of Appeals observed, the prosecution disclosed the letters and offered them to Petitioner upon becoming aware of their existence. *Hathaway*, 2015 WL 3917620 at *3.   Furthermore, Petitioner, "having written [the letters] himself, had knowledge of [them] independent of discovery" and, therefore, cannot claim to have been unfairly surprised by their contents or admission into evidence.  *Ibid.*   Accordingly, this claim is rejected.

## III.   Denial of Motion for Mistrial

During her direct examination, Tammy Kesemeyer testified about a conversation she had with Jasmine immediately after discovering Petitioner and Jasmine in the kitchen in the dark.   Tammy testified that, after Petitioner exited the residence, she spoke with Jasmine.   (ECF No. 10-10, PageID.649-50, Trial Transcript, January 24, 2014, at 88-94).   Jasmine told her mother that Petitioner had been sexually assaulting her and that she only recanted her allegations previously because she was scared.   (*Id.* at 93-94).

19

In response, Tammy was "not supporting" of her daughter's allegations.  (*Id.* at 94).  Tammy responded this way because she "didn't want to accept" what her daughter was telling her.  (*Id.*, PageID.650-51, at 94-95).  Tammy later testified, however, that her relationship with Jasmine subsequently changed.  (*Id.* at 98).  When the prosecutor asked Tammy to identify the "factors" that led her to now supporting her daughter, Petitioner objected.  (*Id.*, PageID.651-52 at 98-99).  The jury was immediately excused so that the matter could be more fully explored.  (*Id.* at 99).

Once the jury was excused, Petitioner moved for a mistrial.  (*Id.*).  Petitioner argued that a mistrial was appropriate because the prosecutor first elicited from Kesemeyer that "she did not believe her daughter" and was now asking her "what made you change your mind, inferring to the jury that she now believes the daughter, and that is improper for any prosecutor to ask a witness whether or not they believe another person or not."  (*Id.*).  The trial judge denied Petitioner's motion, noting that the prosecutor did not ask Tammy to comment on Jasmine's credibility, but rather asked Tammy to discuss the reasons why the relationship with her daughter ultimately changed.  (ECF No. 10-10, PageID.652-53, Trial Transcript, January 24, 2014, at 99-103; ECF No. 10-11, PageID.678, Trial Transcript, January 28, 2014, at 15-16).

Petitioner argues that the denial of his motion for mistrial violated his right to a fair trial and warrants habeas relief.   While framed as a claim regarding the denial of his motion for mistrial, Petitioner's claim is, in fact, that the trial court's ruling on an evidentiary matter was improper and violated his right to a fair trial.

Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding.   *See Wilson v. Sheldon*, 874 F.3d 470, 475-76 (6th Cir. 2017).   Habeas relief is warranted, however, if the evidentiary ruling was "so egregious that it results in a denial of fundamental fairness."   *Ege v. Yukins*, 485 F.3d 364, 375 (6th. Cir. 2007). Fundamental fairness does not, however, "require a perfect trial."   *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994).   Moreover, courts have defined those errors which violate fundamental fairness "very narrowly."   *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).   State court evidentiary rulings satisfy due process unless they "offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."   *Wilson*, 874 F.3d at 475-76.

Ultimately, whether the admission of evidence constitutes a denial of fundamental fairness "turns upon whether the evidence is material in the sense of a crucial, critical highly significant factor."   *Ege*, 485 F.3d at 375.   The Sixth Circuit has found that the improper introduction of evidence violated a criminal defendant's right to a fair trial where the challenged evidence was the only direct evidence linking the defendant to the crime.   *See Ege*, 485 F.3d at 374-78.   However, where there

21

exists sufficient other evidence of guilt and the challenged evidence is only "peripheral to the case against" the defendant, the Sixth Circuit has found no due process violation.  *Collier v. Lafler*, 2011 WL 1211465 at *3 (6th Cir., Mar. 30, 2011).

The testimony challenged presently was only peripheral to the case against Petitioner.  The testimony by Jasmine Kesemeyer was more than sufficient to establish Petitioner's guilt.  The Michigan Court of Appeals rejected Petitioner's claim that the evidence in question was improperly admitted:

> Here, [K e s e m e y e r] did not opine as to the credibility of the victim, but rather testified that she initially did not support the victim and remained close with defendant, but that her relationship with the victim changed over time. The prosecutor asked what factors produced the change, but defendant objected before [K e s e m e y e r] could respond, and the trial court sustained the objection. The prosecutor's questions were not evidence, and the prosecutor specifically asked [Kesemeyer] not to provide an opinion on whether she believed the victim. The trial court did not err in denying defendant's motion for a mistrial, it cannot be said that this testimony denied defendant a fair trial.

*Hathaway*, 2015 WL 3917620 at *3.

The decision rejecting this claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue upon which habeas relief may be granted.

## IV.    Prosecutorial Misconduct

Petitioner alleges that his right to a fair trial was violated by improper comments by the prosecutor during closing argument.   Petitioner's arguments are each addressed below.

When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis...is the fairness of the trial, not the culpability of the prosecutor."  *Cockream v. Jones*, 382 Fed. Appx. 479, 484 (6th Cir., June 29, 2010) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982).   The issue is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)); *see also*, *Givens v. Yukins*, 2000 WL 1828484 at *6 (6th Cir., Dec. 5, 2000) ("[t]he aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused") (quoting *Phillips*, 455 U.S. at 219).

Accordingly, even if the challenged comments were improper, habeas relief is available only where the comments were "so flagrant as to render the entire trial fundamentally unfair."  *Gillard*, 445 F.3d at 897.   It must also be remembered that this Court "does not possess supervisory powers over state court trials" as "it is the responsibility of the state courts to police their prosecutors."  *Gordon v. Burt*, 2016 WL 4435355 at *11 (W.D. Mich., Aug. 23, 2016) (quoting *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000)).

23

A.    Petitioner's Faith

In her closing argument, the prosecutor made the following comments to which Petitioner objects:

> Faith. Faith. Faith is an interesting part of these letters as well, and we're going to go through all of them. All of a sudden we're talking about God, right? We're quoting Bible passages.  We're gonna find a church.  You know, all those things you wanted to do, Tammy, you know that wedding I never gave you all these 15 years we've been together, that wedding you always wanted.  Well, I had a dream about that wedding, and I'm gonna make it come true for you, baby, but you got to get her out of the picture.
>
> I need you, and you know what, while we're talking about all this, I just want to make sure you remember, I put it in big bold letters, God put us together for a reason. We all have different fates. We all have different beliefs, but I don't think God put them together for this reason, so that Tammy could go tell lies to her child who's been sexually assaulted by Leon Hathaway for a period of about four years. God put us together so you could convince her not to testify. God put us together so you could tell her lies, put your thumb on her, make sure she didn't come. God did that?

(ECF No. 10-12, PageID.742, 744, Trial Transcript, January 29, 2014, at 23, 33).

The Court is not persuaded that the prosecutor was unfairly attacking Petitioner's religious faith.   In his letters to Tammy Kesemeyer, two themes stand out: (1) Petitioner's belief that God brought he and Tammy together for some greater purpose and (2) Petitioner's obsession with convincing Tammy to do whatever was necessary to get Jasmine to not testify against him.   (ECF No. 10-9, PageID.592-94, Trial Transcript, January 23, 2014, at 160-70; ECF No. 10-11, PageID.679-84, Trial Transcript, January 28, 2014, at 20-42).   As the Michigan Court of Appeals observed,

"[t]he prosecutor's somewhat sarcastic rhetorical question about whether God put the couple together for the purpose of influencing the victim's testimony was colorful but based on the evidence and not an improper reference to defendant's invocation of his faith." *Hathaway*, 2015 WL 3917620 at *4.

The Court finds that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

B.    Petitioner wanted Jasmine to Commit Suicide

Petitioner next argues that the following comments by the prosecutor constituted an unfair argument that he wanted Jasmine to commit suicide.

> I also have to say, this is to Tammy, ever since Jasmine has come home, you've been acting funny, like she has her thumb on you instead of you having your thumb on her. You were putting great pressure on her, honey, it was working, she almost killed herself. I would have been out of here. There wouldn't have been a witness, but you let up, you're letting me down, you got to get your thumb back on her. . .Okay. Now we're getting desperate, because we've lost control of Tammy. Okay. We got this person on the outside who was doing great. She had all this pressure on her. She was taking away the friends. She was towing the party line. Jasmine almost killed herself. Yeah, no witness. But now Tammy's not doing her job anymore. So now we got to really make this, you know, guilt trip happen, you know, the rest of my life for something I didn't do.

(ECF No. 10-12, PageID.742, 743-44, Trial Transcript, January 29, 2014, at 23, 26-27, 33).

The Court discerns nothing improper in these comments.  As the Michigan Court of Appeals observed, Petitioner wrote in one letter that "the pressure [Tammy] was putting on [Jasmine] was working because [Jasmine] almost killed herself."  *Hathaway*, 2015 WL 3917620 at *4.  Thus, the court concluded that "[i]n light of other letters expressing defendant's desire to pressure the victim and the victim's testimony that she attempted suicide after she read the letters," the prosecutor's comments were "vivid but reasonable comments given the contents of the letters and the timing of the victim's suicide attempt."  *Ibid.*

This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  It was likewise not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue upon which habeas relief may be granted.

C.    Petitioner would have Sexually Assaulted Morgan

Petitioner argues that the prosecutor's following comments were improper:

> I would submit to [you] that if Morgan started sitting on his lap, he might have started to touch her, too, and he knew he had to cut that off. So no Morgan on the lap.

(ECF No. 10-12, PageID.753, Trial Transcript, January 29, 2014, at 70).

Morgan Hathaway testified that Jasmine "would always sit on [Petitioner's] lap and go on car rides with him."  (ECF No. 10-11, PageID.694-95, Trial Transcript, January 28, 2014, at 82-83).   Morgan further testified, however, that Petitioner did

not allow her to sit in his lap or go for car rides.    (*Id.* at 83).    In rejecting this claim,

the Michigan Court of Appeals concluded:

> the prosecutor argued that the defendant might have been compelled
> to touch the younger sister if she had been allowed to sit on his lap. This
> inference can be made from the evidence that the younger sister was
> upset due to not being allowed to sit on defendant's lap by defendant
> himself. The prosecutor argued that defendant did not want the victim's
> sister in his lap because he did not want to molest her as well. We do not
> find [this] comment to be an improper argument from the evidence or in
> context.

*Hathaway*, 2015 WL 3917620 at *4.

This decision is neither contrary to, nor involves an unreasonable application

of, clearly established federal law.   It was likewise not based on an unreasonable

determination of the facts in light of the evidence presented.    Accordingly, this claim

raises no issue upon which habeas relief may be granted.

D.    Jury Sympathy

Petitioner next argues that the prosecutor improperly appealed to the

sympathy of the jury by making the following comments:

> What are you supposed to be doing when you're 12? Playing outside with
> your little siblings. Watching TV, watching movies. You're not supposed
> to be in your bedroom on your back with a grown man forcing his penis
> into your vagina.

(ECF No. 10-12, PageID.753, Trial Transcript, January 29, 2014, at 67).

As courts recognize, there is a "demarcation line that divides appropriately

evocative recapitulations of the evidence from vulgar attempts to manipulate and

exploit the jurors' passions and sympathies."    *Clarke v. Warren*, 556 Fed. Appx. 396,

407 (6th Cir., Feb. 10, 2014).    Nonetheless, the Court discerns nothing unfair about the prosecutor's comment.    The prosecutor did not encourage the jury to feel sympathy for the victim or suggest that others would be victimized in the absence of a conviction.    Instead, the prosecutor merely argued that a 12-year-old girl should not be forcibly raped.    The facts of this case are disturbing, but "prosecutors have no affirmative obligation to conceal or shy away from [such] facts."    *Id.* at 407-08.

The Michigan Court of Appeals rejected this argument, finding such to be appropriate in context and consistent with the evidence presented.    *Hathaway*, 2015 WL 3917620 at *4.    This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.    Furthermore, it was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

E.    Misstatement of the Evidence

Finally, Petitioner argues that his right to a fair trial was denied when the prosecutor misstated the evidence in her closing argument.    While the prosecutor did make a misstatement of fact in her argument, such did not deprive Petitioner of a fair trial and, therefore, does not merit relief.    During her rebuttal argument, the prosecutor stated the following:

> This is a man – when you look at the timeline in the proper order, we've got a kid who snuck out the window one time before the CPS report. What was their reaction to that?  What does he do?  Come sleep in my room, okay.    Now, Tammy's gonna get up in the morning, because she's on the early shift, and I'm going to have you in my room alone.    Tammy said, yes, that happened sometimes.    That happened on occasion.    I got

up and I went to work and there was Jasmine sleeping on the floor, and there he was.   That did happen.   The only person who says it didn't, is this guy.   He say, no, I was working all the time, that's crazy.   She'd get up and go with her mom.   No, that never happened, right.   This is the guy who said let me isolate you from all your people. Let me nail your window shut. Come sleep in my room.

(ECF No. 10-12, PageID.755-56, Trial Transcript, January 29, 2014, at 78-79).

As Petitioner notes, there was no testimony that *he* encouraged Jasmine to sleep in the bedroom with him and Tammy.   Rather, it was Tammy that encouraged Jasmine to do so.   Specifically, after catching Jasmine sneaking out of the house, Tammy decided that "in order to avoid [Jasmine] sneaking out again, [she] would have [Jasmine] sleep in [her] room."   (ECF No. 10-11, PageID.689, Trial Transcript, January 28, 2014, at 60-61).   When this occurred, however, Tammy would get up at 5:00 a.m. the following morning to go to work leaving Petitioner and Jasmine alone in the bedroom.   (*Id.* at 61).   Thus, the prosecutor correctly argued that Jasmine slept in the same room as Petitioner and Tammy and, furthermore, that Petitioner and Jasmine remained in the room alone after Tammy went to work.   The prosecutor misstated the evidence, however, when she asserted that the idea for this arrangement originated with Petitioner.

The Court is not persuaded that the prosecutor's misstatement constituted a denial of due process.   The comments were isolated and not so flagrant as to render the entire trial fundamentally unfair.   The Michigan Court of Appeals rejected this claim, finding that the prosecutor's misstatement concerned "a relatively minor point."  *Hathaway*, 2015 WL 3917620 at *4.   The court also noted that Petitioner

immediately objected in response to which the court instructed the jurors that the prosecutor's comments were not evidence and, moreover, to only accept statements that were supported by the evidence.    *Ibid.*

The rejection of this claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law.    Likewise, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## V.    Sentencing Claims

Petitioner asserts several claims related to his sentencing.    First, Petitioner argues that the trial court inaccurately calculated his sentencing guidelines score. Plaintiff next argues that he is entitled to relief because the court improperly imposed consecutive, rather than concurrent, sentences for two of his convictions.    Finally, Plaintiff argues that the trial court engaged in improper fact-finding which increased his sentence.

### A.    Scoring of the Sentencing Guidelines

Petitioner argues that the trial judge incorrectly scored several of the relevant offense variables resulting in an inaccurate sentencing guidelines score.    This claim, however, is not cognizable as it implicates state law only.    *See* 28 U.S.C. § 2254(a) (the federal courts can only consider habeas claims alleging "violation of the Constitution, laws, or treaties of the United States"); *Lay v. Skipper*, 2021 WL 1884060 at *3 (6th Cir., Jan. 28, 2021) (assertions that a state court miscalculated

state sentencing guidelines "is a matter of state concern only"). Accordingly, this claim is rejected.

B.     Consecutive Sentences

With respect to two of Petitioner's convictions for First Degree Criminal Sexual Conduct, the trial court sentenced Petitioner to consecutive sentences of 25-50 years. Petitioner argues that this violates his right to due process. However, where state law authorizes the imposition of consecutive sentences, claims concerning consecutive sentencing do not violate due process or any other federal law or protection. *See, e.g. Carter v. Warden*, 2021 WL 858465 at *12 (S.D. Ohio, Mar. 8, 2021) (collecting cases).

Under Michigan law, where a defendant has been convicted of First Degree Criminal Sexual Conduct "the court may order a term of imprisonment [for First Degree Criminal Sexual Conduct] to be served consecutively to any term of imprisonment imposed for any other criminal offense arising from the same transaction." Mich. Comp. Laws § 750.520b(3). Under Michigan law, two crimes are part of the same transaction if they "grew out of a continuous time sequence." *People v. Ryan*, 819 N.W.2d 55, 63-64 (Mich. Ct. App. 2012).

Jasmine Kesemeyer testified that Petitioner, on more than one hundred occasions, penetrated her digitally and later with his penis during the same assault. (ECF No. 10-9, PageID.585-88, Trial Transcript, January 23, 2014, at 134-45). Each of these acts constitutes a separate criminal offense. Mich. Comp. Laws § 750.520b(3). As such, Michigan law authorized the imposition of consecutive

sentences for these two crimes.    Accordingly, the Michigan Court of Appeals rejected this claim.   *Hathaway*, 2015 WL 3917620 at *7-8.

This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.    Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

C.    Improper Fact Finding

Petitioner next argues that in scoring several of the variables in his sentencing guidelines score the trial judge improperly made factual findings which increased "the floor of [his] permissible sentence" in violation of the Sixth Amendment.    For the reasons articulated below, the Court finds that this claim is moot.

In *Alleyne v. United States*, 570 U.S. 99 (2013), the Supreme Court held that "any fact that, by law, increases the penalty for a crime. . .must be submitted to the jury and found beyond a reasonable doubt."    *Id.* at 103.    Accordingly, "mandatory minimum sentences may only be increased on the basis of facts found by a jury or admitted by a criminal defendant."    *Robinson v. Woods*, 901 F.3d 710, 712 (6th Cir. 2018).

In 2015, after Petitioner had been sentenced, the Michigan Supreme Court, concluded that Michigan's sentencing scheme ran afoul of the Supreme Court's decision in *Alleyne*.    *See People v. Lockridge*, 870 N.W.2d 502, 519 (Mich. 2015). Specifically, the court found that "the Sixth Amendment does not permit judicial fact-

finding to score [offense variables] to increase the floor of the sentencing guidelines range." *Ibid.*   Thus, the Michigan Supreme Court held that the Michigan sentencing guidelines were no longer mandatory.  *Id.* at 519-21.

Having reached this conclusion, the court had to determine the remedy to which a defendant whose sentence had been imposed in violation of this authority was entitled.   In this respect, the court found that where a defendant's sentence was calculated in violation of the Sixth Amendment, "the case should be remanded to the trial court to determine whether that court would have imposed a materially different sentence but for the constitutional error."[3]   *Id.* at 521-23.

This is precisely what happened in this case.   As previously noted, the Michigan Supreme Court found that Petitioner's sentence was improper and remanded the matter to the trial court "to determine whether the court would have imposed a materially different sentence under the sentence procedure described in *People v. Lockridge.*"   *People v. Hathaway*, 879 N.W.2d 265 (Mich. 2016).   On remand, the trial court affirmed Petitioner's sentence.   (ECF No. 13-2, PageID.1303-05).   The Sixth Circuit has found that this process employed by the state courts to remedy any Sixth Amendment violations is sufficient and is not a basis for granting habeas relief.  *See, e.g., Morrell*, 12 F.4th at 632-33 (the state could remand such matters for full re-sentencing hearings, but is not required to as *Crosby* hearings do

---

3 These truncated remand determinations are referred to as *Crosby* hearings.  *See Morrell v. Wardens*, 12 F.4th 626, 631-32 (6th Cir. 2021).

not violate clearly established federal law); *McLilly v. Nagy*, 2023 WL 21145 at *6 (6th Cir., Jan. 3, 2023) (same).   Accordingly, this claim is rejected as moot.

## VI.   Evidence that Petitioner was Incarcerated

As previously noted, the prosecution introduced into evidence numerous letters that Petitioner wrote to Tammy Kesemeyer.   Petitioner argues that his right to a fair trial was denied because the jury was informed that he wrote these letters while he was incarcerated awaiting trial.   The Court disagrees.

As the Supreme Court has observed, "[t]he presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." *Estelle v. Williams*, 425 U.S. 501, 503 (1976). Accordingly, courts are cautioned to "be alert to factors that may undermine the fairness of the fact-finding process." *Ibid.*   One circumstance that has the potential to undermine the fairness of a criminal trial is for the jury to know that a criminal defendant is presently incarcerated.   *Id.* at 504.   For this reason, courts "have, with few exceptions, determined that an accused should not be compelled to go to trial in prison or jail clothing because of the possible impairment of the presumption so basic to the adversary system." *Ibid.*

Not every reference, however, to the fact that a defendant is in jail violates the defendant's right to a fair trial.   *See, e.g., United States v. Flores*, 572 F.3d 1254, 1262 (11th Cir. 2009) (while words such as "jail, prison, and arrest" should generally be avoided, the "mere utterance" of such words does not erode the presumption of

innocence).   Rather, it is only where some action or statement constitutes "a continuing influence throughout the trial" that there exists a threat to a defendant's presumption of innocence.   *See Estelle*, 425 U.S. at 504-05.

Petitioner did not present this claim on direct appeal, but instead asserted it for the first time in his post-conviction motion for relief in the trial court.[4]   In rejecting this claim, the trial court observed that the letters Petitioner wrote from jail were relevant in that they "evidenced his attempts to convince the victim's mother to dissuade the victim from testifying and to coordinate their stories about 'the kitchen incident. . ., using his incarcerated status to ply her with guilt."   (ECF No. 13-3, PageID.1314).   Accordingly, the trial court concluded that "the references to defendant's pre-trial incarceration were properly admitted in the context of his efforts to suppress or influence testimony against him, and as such, the references to his incarceration did not render his trial unfair."   (*Id.*).

Petitioner has failed to identify, and the Court has not located, any Supreme Court (or other) authority suggesting that a passing reference that a defendant was then in jail, otherwise relevant, violates the defendant's right to a fair trial. Accordingly, the denial of this claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law.   Furthermore, this

---

4 Petitioner did not appeal this decision to the Michigan Court of Appeals or the Michigan Supreme Court.   Thus, Petitioner has failed to properly exhaust this claim. Petitioner's failure to exhaust notwithstanding, the Court can deny this claim on the merits.   *See* 28 U.S.C. § 2254(b)(2).

decision was not based on an unreasonable determination of the facts in light of the evidence presented.    Accordingly, this claim raises no issue upon which habeas relief may be granted.

## VII.    Ineffective Assistance of Counsel

Lastly, Petitioner asserts that his trial counsel rendered ineffective assistance thereby depriving him of the right to a fair trial.    Specifically, Plaintiff argues this his attorney failed to: (1) investigate and present a substantial defense; (2) failed to object to prosecutorial misconduct; and (3) failed to object when he was sentenced on the basis of inaccurate information.

To establish ineffective assistance of counsel, Petitioner must show both deficient performance by his counsel and prejudice resulting therefrom.    *See Premo v. Moore*, 562 U.S. 115, 121 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)).    To establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness."    *Premo*, 562 U.S. at 121 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).    A court considering a claim of ineffective assistance must apply a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance."    *Premo*, 562 U.S. at 121 (quoting *Strickland*, 466 U.S. at 689). Petitioner's burden is to show that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Premo*, 562 U.S. at 121-22 (quoting *Strickland*, 466 U.S. at 687).

36

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance.    Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."    *Premo*, 562 U.S. at 122 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)); *see also*, *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008).    In the context of a sentencing proceeding, Petitioner must demonstrate that there exists a reasonable probability that, but for counsel's errors, he would have received a more favorable sentence.    *See, e.g., Stumpf v. Robinson*, 722 F.3d 739, 753-54 (6th Cir. 2013) (to prevail on a claim that counsel rendered ineffective assistance at sentencing, petitioner must demonstrate that there exists a reasonable probability that absent counsel's errors he would have received a different sentence).

The issue is whether counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."    *Premo*, 562 U.S. at 122 (quoting *Strickland*, 466 U.S. at 690). This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory."    *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

As the Supreme Court has made clear, even when reviewing an ineffective assistance of counsel claim *de novo*, "the standard for judging counsel's representation is a most deferential one."    *Premo*, 562 U.S. at 122.    Likewise, the

standard by which petitions for habeas relief are judged is "highly deferential." Thus, when reviewing, in the context of a habeas petition, whether a state court unreasonably applied the *Strickland* standard, review is "doubly" deferential. *Id.* (citations omitted).   As the *Premo* Court concluded:

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial.   Federal habeas courts must guard against the danger of equating reasonableness under *Strickland* with unreasonableness under § 2254(d).   When § 2254(d) applies, the question is not whether counsel's actions were reasonable.   The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* at 122-23 (internal citations omitted).

With respect to Petitioner's claims that his trial counsel failed to conduct an adequate investigation and present a substantial defense, even if the Court assumes that counsel's performance was deficient, Petitioner has presented absolutely no evidence that he was prejudiced by his counsel's allegedly deficient performance. Petitioner has presented no evidence that had his counsel undertaken the steps he argues should have been taken that such would have produced any evidence favorable to his defense.   Likewise, Petitioner has failed to identify any witness or potential witness, with testimony favorable to his defense, who his attorney failed to call.

Petitioner's claim that his trial attorney failed to object to alleged prosecutorial misconduct fails because, as discussed above, the prosecutor did not engage in any misconduct and Petitioner has failed to show that had his attorney objected such was likely to produce a different result.   Likewise, Petitioner's claim that his counsel

failed to object at sentencing fails because Petitioner has failed to demonstrate that an objection by his attorney would have reasonably resulted in a different sentence.

Petitioner's ineffective assistance of counsel claims were rejected by the state courts. This result is neither contrary to, nor involve an unreasonable application of, clearly established federal law. Likewise, this result is not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, these claims raise no issue upon which habeas relief may be granted.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Hathaway's petition for writ of habeas corpus be denied. The undersigned further recommends that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000); *Miller-El*, 537 U.S. at 336.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: April 11, 2023

/s/ Phillip J. Green
PHILLIP J. GREEN
United States Magistrate Judge